IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0742-07






MARCUS LEE TUCKER, Appellant



v.



THE STATE OF TEXAS





ON STATE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE THIRTEENTH COURT OF APPEALS


HARRIS COUNTY





 Keller, P.J., delivered the unanimous opinion of the Court.



 Appellant used a knife or some other sharp object to stab and cut the victim numerous times. 
The question here is whether the evidence was legally sufficient to show that the object that caused
the wounds was a deadly weapon in the manner of its use or intended use. Answering that question
"yes," we reverse the judgment of the court of appeals.


I. BACKGROUND


 Appellant was charged with aggravated assault by using a deadly weapon. The court of
appeals recited the following evidence as pertinent to the deadly weapon issue:

The State offered evidence on this issue from three sources. First is the testimony of
Houston police officer Dennis Vonquintus, (1) who stated that he arrived at the scene
and saw the complainant's shirt soaked in blood. Vonquintus testified primarily about
two wounds: a puncture wound to the back of the complainant's neck near her spine,
and a puncture mark on her arm. Upon noticing the second wound, the complainant
stated to Vonquintus that appellant carried a two-inch folding knife. Vonquintus was
told by the complainant that she and appellant had fought but she had not seen
appellant use a weapon other than his fists. Vonquintus testified the two injuries
could not have been caused by a fist.


Vonquintus further testified there was another injury "somewhere around her upper
back," and other injuries on the complainant's back, but he could not see them. 


Vonquintus testified that, in his experience, these were clean cuts and "my first
thought was that [appellant] had stabbed [the complainant]." At this point in his
testimony, the following exchange occurred between the prosecutor and Vonquintus:


 Q. Did you know what object, specifically?


 A. No.


 Q. Would you classify it as an unknown object?


 A. Yes.


 Q. Would you classify it as a deadly weapon?


 A. Yes.


Vonquintus could not tell if the bleeding was life-threatening, only that the
complainant was bleeding profusely. Vonquintus admitted the complainant never
said she had been stabbed. However, Vonquintus formed that opinion because, in his
experience, victims of crime do not always realize the nature of their injuries. 


The complainant's medical records state she was treated for stab wounds to the back
and forearm. The records do not indicate that either wound required stitches. The
complainant was released after spending the night in the hospital.


After leaving the hospital, the complainant was interviewed and photographed by
Janet Arceneaux, also an officer with the Houston police department. (2) Arceneaux
described the complainant's injuries as being "lacerations," which was clarified as
meaning "some kind of cut."


* * *


At one point, Arceneaux described a bandage on the complainant's back which
covered an injury. Arceneaux did not remove the bandage but rather relied upon the
complainant's description of the injury. When asked what she had been told by the
complainant, Arceneaux testified: "She had a stab wound. Well, I'm sorry. She had
a laceration to the back upper neck area that appeared to be like a cut. And then she
had one close to her spine."

 

Arceneaux testified that the injuries could have been inflicted by a knife and perhaps
a key depending on the type of key and the manner of its use. During her testimony,
Arceneaux answered affirmatively when asked: "[W]ere the injuries that you saw on
[the complainant] consistent with being inflicted with some sort of object that could
be considered a deadly weapon?" (3)


The court of appeals described the above as "the sum of the evidence" related to the issue at hand. (4)

 After reviewing the record, we find this recitation to be incomplete with respect to
Arceneaux's testimony. Arceneaux also testified that the victim suffered "stab wounds to the back
of her neck, close to her spine, and she was in a lot of pain." In addition, Arceneaux testified that
the victim suffered "a through and through laceration cut," saying that it appeared "that whatever
object that was used went all the way through her arm." And when asked, "If a key had been used
to inflict this type of injury, (5) would you consider a key a deadly weapon," Arceneaux responded
affirmatively.

 Appellant was convicted of aggravated assault and he appealed, claiming, among other
things, that the evidence was legally insufficient to show that he used or exhibited a deadly weapon
during the commission of the assault. After reciting what it considered to be the sum of the evidence
relating to the issue, the court of appeals considered a number of factors that it believed showed that
the evidence was insufficient to support the deadly weapon finding. (6) The court of appeals stated that
no threats were made by appellant during the incident, that there was no testimony about the
sharpness of the folding knife that appellant carried, that neither Vonquintus nor Arceneaux testified
that the folding knife had the ability to inflict death or serious injury (though both testified that the
weapon that caused the injuries could be classified as a deadly weapon), that the actual knife was not
introduced into evidence, that there was no evidence on the manner in which appellant used the
knife, that the complainant was unable to see the knife as it was used because she was lying on the
ground with her hands over her face, that the wounds on the back and forearm were not severe
enough to require stitches, and that no expert testimony was offered to support a deadly-weapon
finding. (7) The court of appeals held that the evidence was insufficient to show that the folding knife,
"as actually used by appellant, was capable of causing death, a substantial risk of death, serious
permanent disfigurement, or protracted loss or impairment of the function of any bodily member or
organ." (8) The court of appeals further held that there was "no evidence whatsoever regarding the
manner of how appellant actually used the knife, much less that he used it or intended to use it in a
manner capable of causing death or serious bodily injury." (9) Responding to arguments made by the
State, the court of appeals stated that "there was no testimony from either Vonquintus or Arceneaux
as to how such a knife as actually used by appellant in the instant case could be used to cause death
or serious bodily injury." (10) With respect to the possibility that a key could have been used as the
weapon, the court of appeals held that the evidence "is even weaker than with the knife because there
was no description of any key." (11) Consequently, the court of appeals sustained appellant's
contention, reversed the judgment of the trial court, and remanded the case for entry of a judgment
of acquittal. (12) 

 In the first ground of its petition for discretionary review, the State complains that the court
of appeals erred in finding that the evidence was legally insufficient to support the deadly-weapon
element of aggravated assault. (13) We agree.


II. ANALYSIS


 Under the variant of the offense of aggravated assault with which appellant was charged, a
person commits an offense if he commits an assault and "uses or exhibits a deadly weapon during
the commission of the assault." (14) A weapon can be deadly by design or use. (15) Neither a folding
knife nor a key are deadly weapons by design. (16) An object is deadly weapon by usage if "in the
manner of its use or intended use," the object "is capable of causing death or serious bodily injury." (17) 
"Serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that
causes death, serious permanent disfigurement, or protracted loss or impairment of the function of
any bodily member or organ." (18) The placement of the word "capable" is crucial to understanding
this method of determining deadly-weapon status. (19) The State is not required to show that the "use
or intended use causes death or serious bodily injury" but that the "use or intended use is capable
of causing death or serious bodily injury." (20) Even without expert testimony or a description of the
weapon, the injuries suffered by the victim can by themselves be a sufficient basis for inferring that
a deadly weapon was used. (21)

 As we explained above, the court of appeals's opinion neglected to take into account all of
the relevant facts, perhaps the most crucial of which was the stab wound that went all the way
through the victim's arm. It does not take expert testimony to recognize that such a wound could
easily have severed a major blood vessel or nerve, placing the victim's life, or at least the use of her
arm, in jeopardy. Even though the victim was fortunate that she did not receive such a serious injury,
the weapon that caused her wound was capable, in its manner of use, of causing serious bodily
injury. In addition, the court of appeals unduly minimized the stab wound to the back of the neck,
near the spine, when it failed to observe that this injury generated a lot of pain. Such a wound,
received in a vulnerable area, (22) would seem to carry at least some potential for resulting in a serious
bodily injury such as paralysis or death.

 The court's assessment of the evidence that it did recite is also somewhat flawed. The court
acknowledged that expert testimony or lay testimony may be sufficient to support a deadly-weapon
finding, (23) but then stated that no expert testimony was offered to support a deadly-weapon finding. 
The court's conclusion ignores the fact that two police officers explicitly stated that the injuries were
inflicted by a deadly weapon. Police officers can be expert witnesses with respect to whether a
deadly weapon was used, (24) and the lengthy experience of both officers, and Arceneaux's position
in a homicide division in particular, suggests qualification as an expert on whether certain wounds
were caused by a deadly weapon. 

 The court of appeals also minimized the officers' testimony in claiming that neither
specifically testified that the folding knife had the ability to inflict death or serious bodily injury.
Though neither officer knew whether the injuries were inflicted by a knife, a key, or some other
object, both agreed, based on the nature of the injuries received, that the weapon that caused the
injuries was a deadly weapon. Other deficiencies in the record alleged by the court of appeals - the 
absence of any detailed description of the knife or key or of exactly how appellant employed the
weapon used to injure the victim - rely upon the incorrect assumption that the use of a deadly
weapon cannot be inferred from the injuries themselves. Whether a deadly weapon can be inferred
solely from the victim's injuries depends, of course, on the nature of those injuries, but in this case,
the jury did not act irrationally in concluding that appellant used a deadly weapon.

 The judgment of the court of appeals is reversed, and the case is remanded to that court to
address appellant's remaining points of error.

Delivered: November 26, 2008

Publish 
1. Vonquintus had been a patrol officer for thirteen years.
2. Arceneaux had been employed by the Houston Police Department for eighteen years
and, at the time of her testimony, was a plain-clothes investigator in the homicide division of the
family-violence unit.
3. Tucker v. State, 221 S.W.3d 780, 782-83, 782 n.2, 783 n.3 (Tex. App.-Corpus Christi
2007). 
4. Id. at 783.
5. This question was asked a little over a page after the testimony about the "through and
through laceration cut." Though the words "this type of injury" may have been referring to that
specific injury, it is not clear on this cold record to which injury or injuries the prosecutor was
referring.
6. Tucker, 221 S.W.3d at 783-85.
7. Id. at 784.
8. Id. 
9. Id.
10. Id. at 785.
11. Id.
12. Id.
13. In its second ground, the State contends that we should overrule Collier v. State, 999
S.W.2d 779 (Tex. Crim. App. 1999), and permit reformation of the judgment to reflect conviction
for a lesser-included offense. Our disposition of the State's first ground obviates the need to address
the second, so the State's second ground for review is dismissed.
14. Tex. Pen. Code §22.02(a)(2).
15. Id., §1.07(a)(17)(A), (B).
16. See McCain v. State, 22 S.W.3d 497, 502-03 (Tex. Crim. App. 2000)("an object that
has an obvious purpose apart from causing death or serious bodily injury cannot be a deadly
weapon" by design; most types of knives are not deadly weapons by design).
17. Tex. Pen. Code §1.07(a)(17)(B); McCain, 22 S.W.3d at 503.
18. Tex. Pen. Code §1.07(a)(46).
19. McCain, 22 S.W.3d at 503.
20. Id.
21. Morales v. State, 633 S.W.2d 866, 868-69 (Tex. Crim. App. 1982)(photograph of deep
slash from just underneath the victim's earlobe across her cheek to the corner of her mouth, closed
by sutures, was sufficient to show that a deadly weapon was used).
22. See id. at 868 (common knowledge that throat is a particularly vulnerable part of the
body).
23. Tucker, at 783, citing English v. State, 647 S.W.2d 667 (Tex. Crim. App. 1983).
24. Hawkins v. State, 605 S.W.2d 586, 588 (Tex. Crim. App. 1980).